W. FLETCHER, Circuit Judge,
dissenting:
The majority holds that a judge suffering from dementia may sentence a man to death. I disagree.
A severely disturbed Ronnie Deere shot and killed Don Davis and Davis’s two young daughters. Deeply remorseful, Deere convinced deputy public defender Glenn Jones to help him obtain a death sentence for his crimes. Deere pled guilty and waived a penalty-phase jury. Jones presented no mitigating evidence. Superior Court Judge Fred R. Metheny sentenced Deere to death in 1982. The California Supreme Court reversed and remanded, holding that a death sentence could not be imposed without the presentation of mitigating evidence. People v. Deere (Deere I), 41 Cal.3d 853, 222 Cal.Rptr. 13, 710 P.2d 925 (1985). On remand in 1986, Jones again refused to present mitigating evidence. Judge Metheny again sentenced Deere to death, even though he had been specifically instructed by the Supreme Court not to do so without hearing mitigating evidence. Judge Metheny held a second penalty hearing a few months later, at which another attorney presented mitigating evidence. At that hearing, Judge Metheny sentenced Deere to death for the third time. The California Supreme Court affirmed. People v. Deere (Deere II), 53 Cal.3d 705, 280 Cal.Rptr. 424, 808 P.2d 1181 (1991).
When Judge Metheny resentenced Deere to death in 1986, he was mentally incompetent. Three attorneys who appeared before Judge Metheny during this period provided affidavits in support of Deere’s state and federal habeas petitions. The attorneys describe Judge Metheny as incompetent and report that his incompetence was general knowledge in the courthouse. The record of Deere’s resen-tencing also shows Judge Metheny’s incompetence.
I believe the evidence already in the record is sufficient to demonstrate that Judge Metheny was mentally incompetent when he resentenced Deere to death in 1986, but that is not the question before us today. The question now before us is much easier: Should the district court have granted an evidentiary hearing on Judge Metheny’s mental competence? The majority holds that such a hearing was not required. I disagree.
It is an open secret that some judges stay on the bench too long. Formal procedures exist for removing senile judges, but they are rarely employed. Attorneys hesitate to challenge judges they appear before, and judges hesitate to blow the whistle on their colleagues. I am as reluctant as most judges to seek to remove a senile judge or to set aside a decision reached by such a judge. But when a man’s life is at stake, I cannot stay silent.
I. Procedural Background
Deere filed a federal habeas corpus petition in 1993, before the effective date of the Antiterrorism and Effective Death Penalty Act (“AEDPA”). Two federal dis *1153 trict judges have dealt with his petition. District Judge Taylor denied Deere’s petition in its entirety in 2001. On appeal from that denial, we wrote that Deere had “c[o]me forward with sufficient evidence at least to trigger a hearing on whether he was, in fact, competent to have pleaded guilty.” Deere v. Woodford, 339 F.3d 1084, 1086 (9th Cir.2003). We held that two declarations ‘“create[d] a real and substantial doubt’ as to Deere’s competency to plead guilty, if they [were] taken at face value and assumed to be true.” Id. at 1087 (quoting Boag v. Raines, 769 F.2d 1341, 1343 (9th Cir.1985)). We remanded for a hearing “on Deere’s claim that he was incompetent to plead guilty, and to reconsider the petition ... as to the claims premised on that contention.” Id. We did not reach any other issues, including Judge Metheny’s competence in 1986.
District Judge Snyder conducted the hearing on remand. In a careful forty-nine-page order, she concluded that Jones provided ineffective assistance of counsel (“IAC”). She held that Jones fell below “an objective standard of reasonableness and performed below the professional standard in his community at the time” when he failed to investigate Deere’s competence to plead guilty. She held that Deere was prejudiced because there was a “reasonable probability that, but for counsel’s unprofessional errors,” Deere would have been found incompetent.
The State appeals Judge Snyder’s decision. Deere continues to appeal Judge Taylor’s decision. The panel majority reverses Judge Snyder’s decision, affirms Judge Taylor’s decision, and denies Deere’s petition. I disagree with the majority on three issues.
First, I would hold that the district court should have granted an evidentiary hearing on whether Judge Metheny was mentally competent when he sentenced Deere to death in 1986. Second, I would hold that the district court should have granted an evidentiary hearing on whether Jones provided IAC in failing to challenge Judge Metheny’s competence in 1986. Third, agreeing with Judge Snyder, I would hold that Jones provided ineffective assistance in failing to investigate Deere’s competence to plead guilty in 1982.
II. Judge Metheny’s Competence in 1986
A. Evidence of Incompetence
Judge Metheny first sentenced Deere to death in 1982. The California Supreme Court reversed the death sentence because Jones had refused to present mitigating evidence and Judge Metheny had imposed the sentence without requiring Jones to do so. Deere I, 222 Cal.Rptr. 13, 710 P.2d at 934. The Court remanded for a new sentencing hearing, holding that a death sentence could not be imposed in the absence of mitigating evidence. Id.
Judge Metheny conducted two resen-tencing hearings after remand. At the first hearing, held on April 21, 1986, Jones again refused to present mitigating evidence. Judge Metheny did not require mitigating evidence and sentenced Deere to death the next day. On May 14, Judge Metheny “stayed” the new death sentence by minute order. Even though stayed, the death sentence triggered an automatic appeal to the California Supreme Court. On June 9, the Court struck the judgment of death and “returned [the case] to the superior court for further proceedings.”
On June 27, 1986, Judge Metheny appointed attorney Jonathan Landau to present mitigating evidence on Deere’s behalf as a friend of the court. A second resen-tencing hearing was held on July 18, 1986, at which Landau presented mitigating evidence. Judge Metheny sentenced Deere to death the same day. The California *1154 Supreme Court affirmed. Deere II, 280 Cal.Rptr. 424, 808 P.2d at 1195.
Evidence of Judge Metheny’s mental incompetence in 1986 falls into two categories. First, three attorneys who appeared before him provided affidavits in which they attest to Judge Metheny’s incompetence in 1986. Second, the record of Deere’s 1986 resentencing, including but not limited to the transcripts, shows Judge Metheny’s incompetence.
1. Attorneys’ Affidavits
Three attorneys who appeared before Judge Metheny in the 1980s provided sworn affidavits in support of Deere’s 1993 state habeas petition. Those affidavits were later provided to the district court in support of Deere’s federal habeas petition.
Attorney Mark Sullivan wrote:
I came to know Judge Fred Metheny in 1983 when he presided over a criminal case wherein I represented the defendant. That experience left me unwilling to risk the liberty of another of my clients in his hands. I resolved never to permit him to be involved in another criminal case of mine.
... In a civil jury trial in 1984, Ohls-son v. Phillips, opposing counsel and I found ourselves bewildered by many of Judge Metheny’s strange rulings and off-hand remarks to the jury. For example, despite the fact that my wife and I had never had any personal relationship whatsoever with Judge Metheny, he told jurors in the case that my wife constantly complained to him that I stayed out too late at night. This was out of the blue and not connected to anything that had transpired.
... By 1986, the only matter of mine which I would agree to allow Judge Metheny to hear was McCready v. Moore, a Superior Court trial de novo of a small claims action. This matter was supposed to last a couple of hours, but we were in our third day of testimony when Judge Metheny appeared to become very frustrated. He stepped down from the bench and started shaking hands with all of the litigants seated at counsel table. Opposing counsel and I just looked at one another in amazement. Judge Metheny then went into the spectator section of the courtroom where many observers had been seated and started shaking hands with them. He told them that he assumed all of the people in his courtroom were Christians and attended church, and remarked upon our inability to settle the case. He then ordered the case dismissed. Opposing counsel and I reported this to the presiding judge, and Judge Noah Ned Jamin informed us that he would be retrying the case in its entirety, which is what he did.
... As the years passed, it seemed as if his condition worsened considerably. It appeared as if he would float in and out of reality. He would not recognize people whom he had known for years. It was a very sad situation, because I am told that he was once a very likeable man.
Attorney Taylor Huff wrote:
I have worked in the Indio [public defender’s] office since approximately March of 1985. I appeared before Judge Fred Metheny between five and ten times from 1985 until his retirement in 1989, but did not conduct any criminal trials before him....
I did have occasion to appear before Judge Metheny for pretrial motions. I recall one lengthy suppression hearing which was held in 1985 in the case of People v. Dyer. It became obvious to me during that hearing that the judge had difficulty grasping the legal concepts involved; and his written ruling ... confirmed my opinion of his slipping grasp.
*1155 ... I was aware of the penalty phase retrial ordered by the California Supreme Court in People v. Deere, as Mr. Deere was represented by Glenn Jones, another deputy in the Indio office. I observed part of these proceedings. In my opinion, it was not appropriate for this capital case to be reassigned to Judge Metheny; I do not believe he was then competent to sit in judgment of a capital case or other serious or complex criminal matters.
Attorney Michael Kennedy wrote:
I was a deputy district attorney in Indio, Palm Springs, and Blythe in 1983 and 1984 and entered private criminal defense practice in those areas in 1985. I had heard of Superior Court Judge Fred Metheny’s reputation among the local prosecution and defense bars as being unable to render appropriate judicial services as long ago as about 1984, while I was still a prosecutor. I specifically recall my supervisor, then-Assistant District Attorney ... Thomas Douglass, Jr., commenting on his anxiety about having complicated evidentia-ry issues heard by Judge Metheny in about 1984. However, it was my impression that the D.A.’s office did not want to shunt cases away from Judge Metheny ... because Judge Metheny’s background as an F.B.I. agent (about which litigants were always regaled at length by the judge) caused him to in-stinetually err on the side of the People....
It was not until about 1988 that I had occasion to appear before Judge Methe-ny.... During those proceedings, ... Judge Metheny came off the bench, following an evidentiary objection by me, assumed a three-point stance on the floor in the open courtroom, ordered me to get down on the floor opposite him (to the horror of the on-looking spectators, court personnel, and my client), and threatened to knock me all the way out into the parking lot. When I declined to “assume the position,” the judge then got up and insisted that I accompany him to the parking lot so he could knock me around. He had, I believe, imagined he was back at Nebraska State, where he was a star football player in the '40’s or thereabouts. That was one of his common regressions, witnessed by anyone foolish enough to take a case before him....
I met with the presiding judge and the criminal calendar judge, who acknowledged the outrageousness of Judge Metheny’s antics, and they requested that I not take the matter to the press or to the commission on judicial performance, given that it appeared that Judge Metheny would be retiring within several weeks.... I chastised these two judges for letting things get so far out of hand with a judge who they, and everyone, knew was not capable of handling the job, to the serious detriment of those whose liberties hang in the balance. They conceded it was a difficult matter to deal with and appeared to regret that things had gone on for so long. It seems that the problem was that Judge Metheny was always on the verge of retirement, for several years, so no one wanted to hurt an otherwise distinguished public servant in the twilight of his career. But those promised, serially impending retirements never materialized ....
... In my opinion, based on what I heard and what I experienced, Judge Metheny was not competent to handle any serious criminal matter, much less a capital case, in 1986, nor do I believe that anyone who knew of the events of those days considered him competent for some undefined time before 1986.
In November 1987, The Press-Enterprise, a local newspaper of general circula *1156 tion, rated judges on the Riverside County Superior Court based on a survey of lawyers and court staff. Judge Metheny was rated the “worst” judge on the Riverside bench by a considerable margin. The paper reported, “His detractors question his intelligence and clarity of thought.” The paper continued:
“He is in a complete fog,” wrote one criminal law attorney with six years in Superior Court. “Doesn’t know what’s going on, can’t make a decision, only wants to talk about World War II and playing football for Nebraska.”
One respondent wrote that Judge Metheny “has simply been in the trenches too long”; another stated that Judge Metheny “appeared] to have little grasp of what’s going on.”
2. Record in Deere’s 1986 Resentencing
Judge Metheny’s mental incompetence was painfully obvious during Deere’s 1986 resentencing. It may be seen in exchanges in the courtroom, and in particular instances of inappropriate behavior. I will give examples of both.
A lengthy exchange took place during the first of the two post-remand sentencing hearings, on April 21, 1986. The State’s attorney, Robert Dunn, began the hearing by introducing transcripts and exhibits from the 1982 sentencing hearing. This evidence, in the State’s view, showed aggravating circumstances warranting the death penalty. After submitting the evidence, Dunn said, “[A]nd the people would rest.” Judge Metheny accepted the evidence and shortly thereafter stated, “You haven’t rested yet.” Dunn repeated, “And we’re going to rest at this time.”
Jones then moved for a ruling that the State’s evidence was insufficient to support a finding of aggravation. Jones said, “I’m asking the Court to make a ruling that what Mr. Dunn has offered you does not justify a finding in aggravation.” Jones had made the same motion at Deere’s first sentencing hearing in 1982, and Judge Metheny had denied it. Now, however, Judge Metheny did not understand the motion. He responded:
I don’t think I’m in a position right now to grant the motion or deny the motion, either one. I think, assuming arguendo, that all the evidence to be introduced by the District Attorney has been offered. If this were the end of it and this were the last shot, it would be a different position for me to view from than if I allow you to go ahead and produce all the evidence that is available and you feel is necessary and proper and supportive, then there’s an opportunity that comes back again to the prosecution and their right to produce additional evidence.
Jones replied, “I don’t disagree if the defendant offers evidence, but we haven’t got to that stage yet.” Judge Metheny then denied Jones’s motion without prejudice.
Jones tried again:
Your Honor, with respect I would ask the Court to articulate the factual findings that permits the Court to come to the decision that there are sufficient aggravating circumstances at this point to justify a finding of aggravating circumstances.
Judge Metheny still did not understand:
Yes. Well, I think there’s a conflict. If you could say it generally without doing two or three days of research on this matter, which may be necessary, but I hope not. I think we’re still looking at this proposition. I’m looking at the case right now although this is the first time I’ve been through it. I haven’t had an opportunity yet to review all the evidence that was dumped in. I think it was dumped in for a good reason. It’s in now. It’s been allowed in. *1157 It’s for me to review. The evidence as I recall it, and I haven’t — and I have reviewed my files, what I think is available. I’ve come to the feeling that what we discussed first of all is that here is a matter, a case that had to do with more than one murder. I think we’re talking about murders at the same time, but there were three murders in this particular case and that would be aggravating if it does apply. I haven’t made up my mind on that because this is a new trial for aggravating and mitigating circumstances.
Another thing to take into consideration is murder involves particularly heinous, atrocious, and cruel actions. Now, I don’t think that’s going to come in on the evidence as far as that’s concerned. It isn’t in yet. You’re asking me to do things ahead of time. That’s just my comment on the side. I really don’t have enough in my mind right now.
There is a possibility that we’ll hear evidence to the effect that Mr. Deere was there and waiting, pursuing a victim while lying in wait. That’s a possibility. But I don’t see how you can ask me or force me now to state what you want me to state until you produce the evidence. I’ve got to make that decision on evidence. I can’t make it out of the wild blue yonder.
Do you understand my position, Mr. Jones?
Jones tried once more:
Your Honor, in all due respect, I do not. I apologize for saying that, but in the end using an analogy, it’s as if we are in a criminal trial and the People have just rested and the defendant is making a motion for judgment upon insufficiency of evidence. We are now in a penalty trial. The People have rested offering their aggravating evidence. I’m making a motion on that evidence asking the Court to make a finding of fact that their aggravating evidence is insufficient, as a matter of law, to support a finding of aggravating circumstances.
Judge Metheny responded:
I will. I will do that. But if this were the first time around and all this was put into evidence right now and you asked me to make your ruling right now I’d say, hey look, I haven’t had a chance to go over all this evidence yet. I don’t have a memory, although I guess I am probably quite a bit smarter than most of the judges around here, but I don’t like to brag about it. My memory isn’t that implicit.
Jones suggested a brief recess to review the evidence, and Judge Metheny said:
Say this was the way the case was handled the first time around. I’d say wait a minute. I want to go over every one of these exhibits and go over the transcripts and find out actually what happened. We didn’t have a lot on it. We didn’t have a lot of the transcript except final argument. We spent a bit of time there. If you give me another two hours or so I would feel much more comfortable. I don’t want to make any more mistakes. I want to do it not for myself or for you but for justice. I can’t tell you right now.
Jones again suggested a recess. Judge Metheny then recessed for lunch. Upon reconvening, Judge Metheny said:
I have done what I thought was absolutely necessary and that is to review the evidence and review the file again so that I’m caught up-to-date as to what has happened and what is happening.
Where were we? A motion?
After being reminded, Judge Metheny continued:
As I look at the situation at this point in time, if I were to balance the evidence *1158 which, of course, isn’t the proper thing to do now, I would have to, based on the evidence, deny the motion.
Jones asked again for Judge Metheny to “articulate for the record what it finds in this case which justifies] a finding of aggravation. That’s been my point all along.” Judge Metheny neither gave the requested articulation nor provided a reason for not doing so.
After Judge Metheny denied his motion, Jones refused to provide evidence in mitigation. District Attorney Dunn then suggested that Judge.Metheny hold Jones in contempt. Dunn emphasized to Judge Metheny that he was required to hear mitigating evidence before sentencing Deere, and that sentencing him without that evidence would be pointless. Judge Metheny did not hold Jones in contempt and did nothing else to secure the presentation of mitigating evidence.
The next day, without having heard any mitigating evidence, Judge Metheny sentenced Deere to death. After sentencing Deere, Judge Metheny informed him that he had sixty days to appeal. Jones reminded Judge Metheny that a death penalty appeal is automatic.
When Judge Metheny resentenced Deere to death in April 1986, he did not understand what the California Supreme Court had told him to do. In 1982, Jones had refused to present mitigating evidence, and Judge Metheny had sentenced Deere to death. In Deere I, the California Supreme Court reversed and remanded for resentencing, specifically holding that a death sentence could not be imposed without the presentation of mitigating evidence. On April 21, 1986, Jones refused to present mitigating evidence, just as he had done four years earlier. On April 22, Judge Metheny sentenced Deere to death without having heard mitigating evidence, just as he had done in 1982. That is, Judge Metheny did precisely what the Supreme Court had unambiguously told him not to do.
Judge Metheny also behaved inappropriately during Deere’s post-remand resen-tencing. Two examples illustrate this point.
First, Judge Metheny decided important issues without Jones or Deere being present. On May 14, 1986, Judge Metheny “stayed” Deere’s April 22 death sentence and appointed an investigator to look for mitigating evidence. The minute order indicates that the prosecutor and Jones were present in the courtroom during proceedings leading to the entry of the order. The next day, Jones wrote a letter requesting that the minute order be changed to reflect the fact that he had not been present. There may, in fact, have been no open courtroom proceedings leading to the minute order. Despite extensive effort, no transcript for May 14 has been located. Judge Metheny may have decided, without notice or hearing, to stay Deere’s death sentence and to appoint an investigator; or he may have held a hearing off the record without either Jones or Deere being present. Judge Metheny held another hearing a month and a half later, on June 27, 1986, at which he appointed Jonathan Landau to supervise the investigation, present mitigation evidence, and act as a friend-of-the-court at a new sentencing hearing. Judge Metheny also established various procedures, withdrew the order of contempt against Jones, and affirmed that Jones would continue representing Deere. Deere was not present in the courtroom, and there was no waiver of his presence.
Second, Judge Metheny made direct off-the-record contacts with witnesses. During the June 27 hearing at which Deere was not present, Judge Metheny stated, “But, as I understand the situation, we have been mighty successful with Mr. Deere’s family. I have contacted them *1159 directly and a number of other people who would be happy to testify the way Justice Mosk wants them to testify.” Judge Metheny also appears to have contacted Deere’s father at some point, for Judge Metheny stated during Deere’s second re-sentencing, “I think Mr. Deere’s father talked to him about it. I don’t think Mr. Deere knows that I know as much as I do about this case.”
There is direct evidence that Judge Metheny interviewed Deere’s mother and two sisters in chambers off the record at the second penalty retrial. Deere’s mother stated in a declaration presented to both the state and federal habeas courts:
Me and my daughters Jeannie and Karen went to the second trial, the penalty trial I think they called it.... [W]e talked to the judge in his chambers. I can’t remember if I testified. All I remember was going into the judge’s chambers and him asking us if we thought Ronnie could be rehabilitated.
Deere’s sister Jeannie DeLeon also remembered the incident. She stated in her declaration:
After we testified, the judge asked us to go into his chambers to talk about Ronnie. He asked us a lot of things about Ronnie, about what kind of life Ronnie would lead if his sentence was overturned. It was real emotional back there.
3. Majority’s Response
The panel majority refuses to recognize the extent and strength of the evidence of Judge Metheny’s mental incompetence. According to the majority, the evidence “reveal[s] no more than eccentricity.” Op. at 1127.
First, the majority focuses on a single sentence in the California Supreme Court’s Deere II opinion that addresses Judge Metheny’s consideration of the evidence. The sentence upon which the majority relies is italicized in the block quotation that appears below. In the view of the majority, this sentence is the “most important ]” factor. “This alone compels the conclusion that Judge Metheny was not impaired[.]” Op. at 1151. The majority takes the Court’s sentence out of context. The Court was responding to an argument that in 1986 Judge Metheny had not been impartial, and that the death sentence was therefore a “mockery.” The Court wrote:
On the contrary, the record indicates that the trial court remained scrupulously fair and objective throughout the proceedings. It carefully weighed and considered both the aggravating and mitigating evidence after they were presented. Indeed, neither defense counsel nor Mr. Landau [who was appointed for the purpose of presenting mitigating evidence] challenged the impartiality of the trial court at any point during the proceedings.
Deere II, 280 Cal.Rptr. 424, 808 P.2d at 1195.
As the full passage makes clear, the Court was not ruling on Judge Metheny’s mental competence. Indeed, the issue of Judge Metheny’s competence was never raised in the direct appeal to the Court. Instead, in the passage just quoted, the Court was ruling on Judge Metheny’s impartiality. District Judge Taylor correctly understood the limited scope of the California Supreme Court’s statement. He wrote:
[The Court’s] findings were made on claims that “the record [wa]s ‘ambiguous’ as to the standards which the trial court applied in determining the penalty, and thus that the sentence is constitutionally unreliable,” and that the resen-tencing was a “mockery.” [Deere II, 280 Cal.Rptr. 424, 808 P.2d at 1194.] Thus, in terms of a claim of mental incompetency on the part of the trial *1160 judge, these factual findings do not preclude relief.
Second, the majority writes that Judge Metheny was sailing in “unchartered waters” when Jones refused to present mitigating evidence on April 21, and when Judge Metheny sentenced Deere to death the next day. Op. at 1149-50. The majority writes, “[Tjhere is simply no evidence — none—that this ruling was other than legal error committed when the judge was confronted with a highly unusual situation.” Id. at 1150. The majority is wrong. The waters were hardly uncharted. What happened in April 1986 was a precise repeat of what had happened in 1982, and the legal issue in 1986 was the precise issue that the California Supreme Court decided in Deere I. The conclusion is inescapable that Judge Metheny’s mental disability was so severe in April 1986 that he simply could not understand the Court’s clear holding in Deere I.
Third, the majority contends that Judge Metheny’s odd statements are merely “out-of-context excerpts.” Id. at 1150. The majority has inadvertently put its finger on part of the problem. Many of Judge Metheny’s comments are indeed out of context. They are oddly irrelevant comments that come out of the blue. More important, the majority fails to take into account Judge Metheny’s in-context remarks. The excerpts from the April 21 hearing, quoted at length above in order to provide context, show in excruciating detail the degree to which Judge Metheny was mentally impaired.
Fourth, the majority belittles the affidavits presented by attorneys Huff, Kennedy, and Sullivan. In the view of the majority, attorney Huffs “declaration boils down to his personal opinion.” Op. at 1150. Attorney Kennedy’s “declaration speaks of ‘rumors.’ ” Id. Attorney Sullivan’s “declaration speaks of ‘strange rulings,’ not otherwise identified”; recounts an “inexplicable statement” without providing a transcript; and recounts an “event” in 1986 that “shows a judge who became exasperated and blew his stack.” Id. at 1151. I disagree. The affidavits of Huff, Kennedy, and Sullivan are serious assessments by serious professionals. Huff, Kennedy, and Sullivan practiced before Judge Metheny, directly observed the behavior they describe, and they knew Judge Metheny’s reputation in the courthouse. All of them concluded that Judge Metheny was incompetent. These attorneys’ affidavits are not casual, offhand, or unsupported evaluations. They are, instead, a terrifying window into Judge Metheny’s courtroom.
Fifth, the majority faults Deere for not providing any medical evaluations of Judge Metheny’s mental competence to serve as a judge in 1986. The majority writes, “Despite having access to a veritable stable of mental health professionals who could have reviewed the transcripts — Dr. Jones, Dr. Rosenthal, Dr. Favazza, Dr. Stewart — not one has opined that Judge Metheny’s statements are evidence of a disordered mind.” Op. at 1150. I do not fault Deere for not asking Drs. Jones, Rosenthal, Favazza and Stewart to evaluate Judge Metheny’s mental competence. They were retained for the specific purpose of evaluating Deere’s competence to plead guilty in 1982.
Moreover, because attorneys and judges are trained to understand legal rules and legal reasoning, they are in some respects better able than medical professionals to assess competence to serve as a judge. The question now before us is whether the district court should have allowed an investigation and evidentiary hearing concerning the mental competence of Judge Metheny. At some point, it may become necessary to have the evaluation of a developed record by medical professionals, *1161 but I emphatically do not believe such an evaluation is required at this stage.
B. Habeas Claims Related to Judge Metheny’s Mental Competence
I would reverse two holdings of the district court related to Judge Metheny’s mental competence. First, I would hold that the district court erred in refusing to grant an evidentiary hearing concerning Judge Metheny’s competence. Second, I would hold that the district court erred in refusing to grant an evidentiary hearing on whether Jones committed IAC by failing to seek recusal of Judge Metheny based on his incompetence.
1. Evidentiary Hearing on Judge Metheny’s Competence
The case law on due process violations resulting from mental incompetence of the decisionmaker is sparse but clear. The Supreme Court has stated unequivocally, “This Court has recognized that a defendant has a right to ‘a tribunal both impartial and mentally competent to afford a hearing.’ ” Tanner v. United States, 483 U.S. 107, 126, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (emphasis added) (quoting Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S.Ct. 651, 56 L.Ed. 1038 (1912)). In Jordan, the Court held that it would violate due process if an insane person were permitted to sit on a jury in a criminal case. Jordan, 225 U.S. at 176, 32 S.Ct. 651. The Court held that due process had not been violated only because the state court, after an evidentiary hearing, had concluded by a preponderance of the evidence that the juror in question was sane. Id. at 173, 32 S.Ct. 651.
A federal habeas petitioner in a pre-AEDPA case is entitled to an evidentiary hearing if “(1) the petitioner’s allegations, if proved, would entitle him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.” Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir.1995) (quoting Hendricks v. Vasquez, 974 F.2d 1099, 1103 (9th Cir.1992)) (internal quotation marks omitted); see also Stankewitz v. Woodford, 365 F.3d 706, 714 (9th Cir.2004). It is undisputed that Deere requested an evi-dentiary hearing on state habeas concerning Judge Metheny’s competence and that his request was denied. Deere thus satisfied the second criterion, as the district court correctly held. The disputed question is whether Deere satisfied the first criterion.
Deere has alleged that Judge Metheny was so mentally impaired in 1986 that he was incompetent to preside over his capital sentencing. Because Deere waived a jury, Judge Metheny himself was required to decide whether Deere would live or die.
Deere has not only alleged facts that would entitle him to habeas relief. He has also provided substantial evidence in support of his allegations. The district court nonetheless denied Deere an evidentiary hearing. The district judge concluded, “Viewed as a whole, the trial judge’s conduct and statements during the proceedings in 1982 and 1986 do not support Petitioner’s allegations.” (To be clear, I do not contend that Judge Metheny was incompetent in 1982. I contend only that he was incompetent in 1986.) The district court did not describe the attorneys’ affidavits, nor any of the other evidence in the record, in explaining its conclusion. The district court concluded that Deere was not entitled to a hearing because the attorneys involved in the case failed to raise the issue of Judge Metheny’s incompetence. The court wrote that attorneys Jones and Landau “were in the best position to observe the competency of the trial judge in 1982 and 1986.” It wrote further, “[Appellate counsel and the prosecutor also appeared before the trial judge, and neither attorney ever made any kind of a *1162 record regarding the alleged incompetency of the trial judge.”
Given the evidence in the record, the district court should not have attached controlling importance to the silence of the attorneys. Lawyers are loathe to challenge as incompetent the judge before whom they are appearing, and before whom they might appear again. In Deere’s case, each of the attorneys had a particular reason not to challenge Judge Metheny. The two defense attorneys in the trial court were Jones and Landau. Jones was actively trying to help Deere get a death sentence, and it was relatively clear that Judge Metheny would impose such a sentence. Landau was not Deere’s attorney in the normal sense; he was retained as a friend of the court for the sole purpose of presenting mitigating evidence at the second resentencing hearing. Further, the prosecutor at trial was following office policy in not objecting to Judge Metheny. As recounted by attorney Kennedy in his affidavit, the prosecutor’s office had a policy of keeping their cases before Judge Metheny, despite his incompetence, because he “in-stinctually err[ed] on the side of the People.” Finally, an appellate lawyer, even if he had wanted to raise the issue of Judge Metheny’s incompetence, would have known that the issue would be properly raised on collateral rather than direct review.
There was considerable evidence of Judge Metheny’s incompetence that the district court declined to describe. I have summarized that evidence above. In my view, that evidence, if believed, is enough to support a determination that Judge Metheny was so mentally impaired he could not, consistent with due process, preside over Deere’s resentencing in 1986. At a bare minimum, Deere was entitled on federal habeas corpus to a hearing on his claim that Judge Metheny was incompetent in 1986. At such a hearing, Deere would have been allowed to introduce additional evidence of Judge Metheny’s incompetence. The State, of course, would have been allowed to introduce its own evidence, if any, and to cross-examine any of Deere’s witnesses.
I realize that Judge Metheny has been dead for many years, and that it will be difficult to determine, more than 25 years after the fact, the precise degree of Judge Metheny’s mental impairment in 1986. It would have been far preferable to have had an evidentiary hearing in 1993, when the issue was first presented to the state and federal habeas courts. It would also have been preferable in 2003, when we remanded to the district court for a hearing concerning Deere’s competence, to have remanded at the same time for a hearing concerning Judge Metheny’s competence. Over my objection, the panel majority declined to add to our 2003 remand order a direction to conduct such a hearing.
I also realize that inquiries into the mental competence of judges pose difficulties. I am sympathetic to the concerns expressed by my colleague, then-judge Ko-zinski, in his dissenting opinion in Summerlin v. Stewart, 267 F.3d 926, 957 (9th Cir.2001) (Kozinski, J., dissenting), opinion withdrawn, Summerlin v. Stewart, 310 F.3d 1221 (9th Cir.2002). In a perfect world, all judges would retire before their mental faculties deteriorate to the point where they are no longer competent to perform as judges. In that world, we would not be faced with the difficult problem of forcing, or encouraging, our colleagues to retire, or with the equally difficult problem of dealing with cases decided by judges who were, or might have been, incompetent.
But this is not a perfect world. Some judges stay on too long. They decide cases when they are no longer competent *1163 to do so. There is credible evidence of mental incompetence in the record before us. Deere has not embarked on a fishing expedition in which he hopes to find evidence of incompetence. He already has such evidence, a lot of it. There may be more evidence still to be found, but Deere has already presented enough to warrant a hearing.
I therefore conclude that the district court erred in refusing to hold an eviden-tiary hearing on whether Judge Metheny was mentally competent when he sentenced Deere to death in 1986.
2. IAC for Failing to Seek Recusal of Judge Metheny
In his state habeas petition, Deere requested an evidentiary hearing on whether Jones committed IAC in failing to seek recusal of Judge Metheny. The state court denied the request. The district court on federal habeas also denied Deere’s request for a hearing on Jones’s alleged IAC in failing to seek recusal based on Judge Metheny’s incompetence.
To establish IAC, Deere must show (1) that Jones’s performance fell below an objective standard of reasonableness; and (2) that the performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An attorney’s performance is deficient when “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Id. There is a strong presumption that counsel’s conduct falls within “the wide range of reasonable professional assistance.” Id. at 689, 104 S.Ct. 2052. To establish prejudice, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052.
If Jones had successfully moved in 1986 to recuse Judge Metheny based on incompetence, Judge Metheny would not have been permitted to resentence Deere. A due process violation based on a valid objection to a sitting judge is structural error such that reversal or vacation of the judge’s order or judgment is automatic. Turney v. Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 71 L.Ed. 749 (1927); Greenway v. Schriro, 653 F.3d 790, 805 (9th Cir.2011) (“[WJhen a defendant’s right to have his case tried by an impartial judge is compromised, there is structural error that requires automatic reversal.”); see also Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 883-84, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009) (in a case of alleged judicial bias, a litigant need not demonstrate actual bias, but rather only a sufficient “risk” of bias).
Deere has presented substantial evidence that Judge Metheny was mentally incompetent in 1986 when he resentenced Deere to death. Deere had convinced Jones that he wanted to die. Jones and Deere struck a “deal” whereby Jones would do almost nothing to avoid the death penalty. I do not believe that such a deal — even if Deere had been competent to make it — permitted Jones, consistent with his duties as an attorney, to permit a violation of due process by allowing a mentally incompetent judge to decide whether his client should live or die.
A showing of prejudice under Strickland requires a showing that there is a “reasonable probability” that Jones would have succeeded in 1986 if he had moved to recuse Judge Metheny on grounds of incompetence. The evidence already in the record is more than sufficient to show that such a motion by Jones would have been successful. The affidavits of Huff, Kennedy, and Sullivan show that Judge Metheny was incompetent in 1986, and that his in *1164 competence was widely known. More specifically, Sullivan’s affidavit recounts that he and his opposing counsel went to the presiding judge in 1986 when Judge Meth-eny came down off the bench, shook hands with the spectators, commented on their Christianity, and dismissed the small civil case in the middle of trial. The presiding judge, well aware of Judge Metheny’s mental state, promptly reassigned the case and retried it himself. If the presiding judge was willing in 1986 to reassign this relatively inconsequential case because of Judge Metheny’s incompetence, there can hardly be any doubt that he would have reassigned Deere’s capital case if Jones had sought recusal.
I therefore conclude that the district court erred in refusing to hold an eviden-tiary hearing on whether Jones committed IAC in failing to seek recusal of Judge Metheny.
III. Deere’s Competence in 1982
We remanded in 2003 for an evidentiary hearing on issues related to Deere’s competence to plead guilty in 1982. After an extensive hearing, the district court concluded that Jones committed IAC in failing to challenge Deere’s competence to plead guilty.
I agree with the district court that there is a reasonable probability that, had attorney Jones properly investigated, Deere would have been found incompetent to plead guilty.
A. Background
Deere was born in 1954. He is of Creek and Seminole heritage through his father. Deere was one of eight children in a very poor family. Deere’s father was a violent alcoholic who abused his wife and beat his children until they bled. Deere’s mother sometimes beat him. The family moved to Blythe, California, from Oklahoma so that Deere’s parents could work as farm laborers. During his childhood, Deere was exposed to pesticides and pollutants in the nearby fields and in the drinking, irrigation, and swimming water.
Deere suffered three or perhaps four episodes of convulsions before he was one year old. He was placed in special education in the third grade because of attention and personality problems. At age ten, Deere had a full-scale I.Q. of 76, which placed him in the sixth percentile. When Deere was ten or eleven years old, he grabbed bare electrical wires and remained in contact with the current for several minutes. The shock adversely affected his coordination. Deere began cutting himself by age eleven. He began running away from home by age twelve. Deere dropped out of school in the eighth grade. He was committed to the California Youth Authority at age thirteen or fourteen.
Deere continued to cut himself in his adulthood, leaving long and deep scars all over his body. Deere repeatedly asked Alice Lyon, the mother of his first daughter, to kill him. Once, after he had seriously cut his hand, he asked police officers to let him die. On another occasion, when police found Deere bleeding from six-inch cuts on both arms and a smaller cut on his chest, Deere refused medical attention. Deere frequently came to the attention of local police for conduct including alcohol-related offenses, disturbing the peace, stealing a cow, and possessing a concealed weapon.
Deere had a tumultuous relationship with Cindy Gleason, the mother of his second daughter. In the six months before the murders, Deere’s self-mutilation increased, and he drank a fifth of vodka each day. Cindy left Deere in January 1982, taking their baby to her mother’s house. Deere began threatening Cindy and her family, including threatening to *1165 kill family members if Cindy left him and took the baby away permanently.
On January 12, 1982, Deere and Cindy met with social worker Virginia Erickson Tiernan. Tiernan noticed a seven- or eight-inch cut on Deere’s arm. Deere told Tiernan that if he did not cut himself, he would hurt others. Tiernan was concerned that Deere was mentally ill and suggested that he go to the local mental-health center. An intake worker at the center diagnosed Deere with marital problems, alcohol abuse, and antisocial personality disorder.
In February 1982, Deere and Cindy briefly reconciled but again separated. Deere’s self-mutilation and substance abuse increased, and he again began threatening Cindy and her family. In the two weeks before the murders, Cindy and her mother called Tiernan two or three times each night. Tiernan regularly asked the sheriff, probation department, and police for help, reporting Deere’s threats against Cindy and her family.
On February 22, 1982, Cindy called Tiernan twice asking for help. Tiernan advised Cindy to get Deere “into mental health” and tried the next day to get Deere placed on a 72-hour psychiatric hold. On the advice of the probation department, Deere returned to the mental-health center on February 25, 1982. The intake worker noticed a cut on Deere’s forearm, but noted that there was “no indication” of any “danger to self’ and instructed Deere to keep his normal appointment for the next week.
On March 3, 1982, Cindy called the police to ask for help. Cindy’s mother called the supervising psychologist at the mental-health center, who told Cindy’s mother that he could not see Deere unless she and Cindy went through “the proper channels.” Cindy called the probation department for help the next day, March 4, 1982. The probation department told Cindy to call the same supervising psychologist. The supervising psychologist told Cindy to set up an appointment. On the afternoon of March 4, Cindy’s former brother-in-law Don Davis picked up his two daughters, Cindy’s nieces, for visitation. Witnesses reported seeing Deere that evening at a local market, drunk or in a daze. That night, Cindy and her sister drove to Davis’s trailer and found the bodies of Davis and the two girls.
Five days later, police found Deere in the desert, missing his shirt and a shoe. Deere told the police he had been living on ditch water and raw birds. He had with him notes he had addressed to Cindy and his parents. Police found a .22 rifle with writing scratched into the wood stock: “if you have gone to doctor I got end the mean Ronnie I wish I understood — Kathy she help kill them now love her — Now live with it for life — you killed them to — Shorty [Cindy] you hurt like me how dose [sic] feel.”
B. Proceedings Leading to Deere’s Guilty Plea
On the afternoon of March 9, 1982, after Deere’s arrest but before appointment of defense counsel, Dr. Tommy Bolger interviewed Deere at the jail. Dr. Bolger had never received formal psychiatric training. He had received a degree of Doctor of Osteopathic Medicine in 1957 and had become a Medical Doctor in 1962 as a result of the California Reunification Act. Dr. Bolger spent most of his career working in the California state prison system. From 1965 to 1970, he worked under the classification “Physician and Surgeon II” at Patton State Hospital. He then worked as a “Chief Medical Officer” at San Quentin prison in 1975 and a “Physician and Surgeon” at Soledad prison from 1975 to 1977. He received a classification as a “Staff Psychiatrist” at Soledad in 1977. He vol *1166 untarily resigned from state service in 1979 and moved to Blythe, where he worked for Riverside County as a “medical and psychiatric consultant.”
Dr. Bolger spoke with Deere for an hour and five minutes. He prepared a report for the police in which he stated, “His intellectual capacity is adjudged a dull normal,” and “Judgement is narrowed and constricted.” Dr. Bolger provided what he called a “diagnostic impression”: “1) Not mentally ill[.] 2) Dependant personality type, with explosive features, Alcohol and drugs a factor. 3) Antisocial personality type, with borderline features, not psychotic.” Dr. Bolger concluded:
Mr. Deere is not mentally ill. He has a severe personality problem. He does understand the nature and [sic] the charges against him and was certainly capable of forming the intent and then carrying out the action. He is capable of cooperating with Counsel in his defense, if he feels it is to his advantage.
Dr. Bolger had interviewed Deere a year earlier in connection with treatment of Deere’s father for seizures and mental health problems linked to alcoholism. At that time, Dr. Bolger had concluded that statements by Deere were “merely [Deere’s] attempt to blame his problems on someone else.” Dr. Bolger did not disclose in his report to the police that he had previously interviewed and formed an impression of Deere. He testified in 1986 that he had had no knowledge of Deere before the 1982 jail interview.
The day after Deere’s jail interview with Dr. Bolger, the court appointed deputy public defender Glenn Jones to represent Deere. Deere told Jones that he did not want a trial, did not want a defense, and wanted to be executed. Deere refused to discuss the facts of the case with Jones and insisted on pleading guilty.
Deere initially pled not guilty, but later moved to change his plea to guilty. On the recommendation of the prosecutor, the court appointed Dr. Bolger to evaluate Deere’s competence before taking his guilty plea. The prosecutor represented to the court that Dr. Bolger was a board-certified psychiatrist. Dr. Bolger himself sometimes represented that he was a board-certified psychiatrist, even though he was not. It appears to have been common knowledge in the community that Dr. Bolger was not a qualified psychiatrist. Dr. William Jones, the psychologist that attorney Jones later retained to evaluate Deere for mental health defenses, testified in the district court that attorney Jones
characterized Dr. Bolger as sort of a hack. No one else would go to Blythe, so they used him in that area. It was someone who had no formal psychiatric training whatsoever[.]
Dr. Bolger interviewed Deere for about an hour and a half on June 19, 1982, and submitted a short report to the court on June 21. Dr. Bolger wrote that Deere had been given two intelligence tests. In his earlier report to the police, Dr. Bolger had written that Deere’s intellectual capacity was “dull normal,” and that he had “narrowed and constricted” judgment. But in the June report to the court, Dr. Bolger reported that Deere was intelligent and had good judgment. Dr. Bolger wrote: “He is given verbal Wechsler and verbal 0[fficer] intelligence] T[est] and scores adequately in the high percentile range.” “Judgement as tested by verbal skills in aforementioned verbal testing is excellent. ... His I.Q. would be adjudged to be in the high range of normal.” There is no indication in the record that Dr. Bolger’s earlier report to the police was ever submitted to the court. Dr. Bolger did not reveal in his report to the court that he had prepared a report for the police or that he had interviewed and formed an impression of Deere a year earlier. Dr. *1167 Bolger concluded in his report to the court that Deere was competent to plead guilty.
On June 25, Deere pled guilty to three counts of murder and admitted a special circumstance allegation. At the time of Deere’s plea, attorney Jones had requested but had not yet received a psychological evaluation. Attorney Jones had seen the scars of self-inflicted wounds on Deere’s arms, chest, and abdomen. He had recognized signs of possible mental illness and had requested funds from the court to retain mental-health experts. (Jones ultimately spent only $1,696.86 of the $5,000 the court awarded for this purpose.) Jones contacted Dr. William Jones, Ph.D. (no relation), a licenced psychologist, and asked him to do a general psychological evaluation of Deere.
Deere initially refused to see Dr. Jones. He agreed to see Dr. Jones only on the condition that Attorney Jones allow him to plead guilty. Dr. Jones interviewed Deere twice. The first interview took place two days before Deere pled guilty. The second interview took place a week later. The first interview took an hour and a half, followed by two and a half hours of psychological testing. The second interview lasted only thirty minutes. Dr. Jones testified in the district court that Deere refused to complete the second interview because “he was not able to deal with the emotions” of discussing the crime or the death penalty.
Attorney Jones did not ask Dr. Jones to evaluate Deere’s competence to plead guilty. Dr. Jones testified in the district court that it was standard procedure in the profession in 1982 not to give an opinion on competence unless asked to do so. Dr. Jones wrote in his report that Deere frequently cut himself to avoid hurting others, “has a very major alcohol abuse problem,” and “ha[s] a major drug abuse problem.” He reported that Deere’s full-scale I.Q. on the “Wechsler Adult Intelligence Scale-Revised” tested at the 7th percentile, or borderline retarded. Deere’s Wechsler “verbal I.Q.” tested “at the 6th percentile, also in the borderline range.” (Recall that Dr. Bolger reported to the court that Deere had scored “in the high percentile range” on this same Wech-sler test.) The tests showed, further, that Deere had reading recognition at about the sixth grade level, in the fifth percentile of persons his age; spelling at the fourth grade level, in the first percentile; and arithmetic at the third grade level, in the fifth percentile.
Dr. Jones diagnosed Deere as having an adjustment disorder with depressed mood, mixed substance abuse disorder, and borderline personality disorder with anti-social aspects. Dr. Jones wrote that Deere had had a long-standing desire to be killed, and that he pled guilty so that the State would fulfill this desire:
He feels that suicide cannot be forgiven, but that it is permissible for someone else to kill him. Consequently, he states that he has frequently asked others to kill him and stab him. He has even paid money for this and on one occasion apparently was stabbed.
Presently Mr. Deere states that he does not care in the slightest what happens to him. He states that if he is given the death penalty he is willing to accept it and indeed would prefer it to life imprisonment. He thinks this would make him feel better, but he is unclear as to how he would feel better if he were dead.
Dr. Jones testified at the evidentiary hearing in the district court that he had been concerned about Deere’s competence, and had expressed his concerns orally to attorney Jones:
I have a recollection that we talked either in person — I believe in person or on the telephone before I prepared the re-
*1168 port. I recall having a — this conversation sticks in my mind more vividly than anything else about this case. The issue on one hand, my reservations that he was so self-destructive and on [attorney Jones’s] hand the idea ... that opting for the death penalty was, in fact, a rational thing for Mr. Deere to do at the time and not, in fact, a — something reflecting incompetence.
When asked at the evidentiary hearing if in 1982 he had “felt Deere was incompetent” and had “in essence ... told [attorney Jones] that,” Dr. Jones replied, “Yes.”
C. District Court Proceedings
The district court conducted extensive proceedings after our 2003 remand. The State and Deere both introduced evidence concerning Deere’s competence in 1982.
1. The State’s Evidence
The State’s evidence consisted of Dr. Bolger’s reports and the report and testimony by Dr. Park Dietz. Dr. Bolger had died by the time of the district court hearing, so the State relied on the two reports he prepared in 1982, both of which are described above.
Dr. Dietz is a board-certified psychiatrist, but he has not treated patients since 1988. He testified that he is the “head” of two corporations, one of which provides expert psychiatric testimony in criminal cases. This firm employs a substantial staff of experts “from various disciplines.” Dr. Dietz described the manner in which his firm prepares cases:
Basically, we seek to obtain all the relevant documents that we can foresee or that the client allows us to know exists. So we typically send a list of documents that we’re requesting.... And then depending on the complexity of the case, the quantity of the documents sometimes more than one expert will work on it. On a simple case with a small stack of documents often that will just be one person’s work. But if there are multiple issues, multiple areas of expertise or extensive documents, we’ll often involve additional experts on the case.
Dr. Dietz has testified in a number of high-profile criminal cases in federal and state court. In somewhere between 80 percent to 90 percent of the cases, Dr. Dietz has testified for the prosecution.
Dr. Dietz did not interview Deere. He testified that his declaration and his testimony were primarily based on the observations of attorney Jones and to some degree on the reports of Dr. Bolger. Dr. Dietz concluded in his declaration, “Mr. Deere was, in my judgment, competent each time he was examined by the court,” including the occasion on “6/25/92 [sic], when Mr. Deere advised the court that it was his wish to change his plea from not guilty to guilty on all counts.” Dr. Dietz testified that Deere’s history and symptoms were “proof’ that he had “a borderline personality disorder.” He testified, “Mr. Deere’s borderline personality disorder did not in my view make him incompetent to enter into the decisions he did in 1982.”
Dr. Dietz relied for his diagnosis in substantial part on a number of statements made by attorney Jones. For example, Dr. Dietz quoted Jones as saying, “He knows the consequences of every decision he’s made, as well as the consequences of his criminal acts.... They are rational, intelligent decisions by a man who realizes what he has done and says, ‘This is the only position I can take to show you that I am still a man and not an animal.’ ”
Dr. Dietz also testified that he trusted Dr. Bolger’s “observations”:
Dr. Bolger’s report contains enough descriptive information of Dr. Bolger’s observations to support the opinion he offers in this report. And judged by the *1169 standards of the day, it was an average or above average competency evaluation.
Dr. Dietz admitted that Dr. Bolger had made a mistake in “estimating” Deere’s I.Q. He wrote in his declaration:
Dr. Bolger could be faulted by the standards of the day for estimating Mr. Deere’s IQ as too high (“high range of normal”) in his report of 6/21/82 and for less than laudatory writing skill.
(Emphasis added.) Dr. Dietz described in his district-court testimony how he thought Dr. Bolger had arrived at his “estimate” that Deere’s I.Q. was in the “high range of normal”:
Well, what he did was an impressionistic evaluation of intelligence, which was fairly common then and many people still do it which is give an off-the-cuff idea of whether they think someone is above average or below average without any testing of that. And his off-the-cuff finding was wrong.
(Emphasis added.) Deere’s attorney asked Dr. Dietz whether Dr. Bolger’s mistake in his “estimate” of Deere’s I.Q. was “a fatal error in his report that makes his conclusion erroneous?” Dr. Dietz replied, “No. The only way it could be is if it turned, out by objective evidence that Mr. Deere was mentally retarded.” (Emphasis added.)
Dr. Jones had concluded in 1982 that Deere was incompetent to plead guilty because he had long felt a compulsion to seek death, had felt that it wrong for him to kill himself, and had desired to be killed by someone else. Deere’s three other professional witnesses agreed with Dr. Jones’s conclusion that Deere’s mental illnesses drove his compulsion to die and thus his decision to plead guilty. Dr. Dietz disagreed with the conclusion that Deere had a “compulsion” to seek death. However, his disagreement was based on a narrow technical definition of “compulsion” that requires the sufferer of the disorder to be self-aware, such that the sufferer is himself aware that his actions are “excessive or unreasonable.”
Dr. Dietz made two obvious mistakes in his testimony. First, Dr. Dietz stated that Dr. Bolger could be forgiven for merely “estimating” Deere’s I.Q. “without any testing.” Dr. Dietz had not been told, or perhaps did not remember, that Dr. Bol-ger had not merely “estimated” Deere’s intelligence. Rather, Dr. Bolger had performed two separate intelligence tests. Dr. Bolger had stated in his report to the court: “He is given verbal Wechsler and verbal 0[fficer] intelligence] T[est] and scores adequately in the high percentile range.”
Second, Dr. Dietz minimized the importance of Dr. Bolger’s mistaken “estimate” of Deere’s I.Q. on the ground that there was no “objective evidence” that Deere was “mentally retarded.” Dr. Dietz had not been told, or perhaps did not remember, that there was indeed objective evidence of mental retardation. Dr. Jones had stated in his report in 1982 that he had tested Deere’s full-scale and verbal I.Q.s, and had found that Deere was borderline retarded.
2. Deere’s Evidence
Deere’s evidence at the district court evidentiary hearing consisted primarily of evaluations by four doctors — Dr. Jones, Dr. Fred Rosenthal, Dr. Armando Favaz-za, and Dr. Pablo Stewart. Two of the four doctors had personally interviewed Deere. All four of them concluded that Deere was not competent to plead guilty in 1982.
As noted above, Dr. Jones interviewed Deere twice in 1982, just before and just after Deere pled guilty, and prepared a contemporaneous report. Dr. Jones wrote in a 1993 declaration:
*1170 Mr. Deere ... had a compulsion to be punished with the death penalty and did not want anyone to interfere with that. Mr. Deere’s insistence on pleading guilty was part of that compulsion and an outgrowth of his mental disturbances; it was irrational.... Mr. Deere was extremely self-destructive to begin with and teetered throughout his life on the edge of suicide, as evidenced most dramatically by his history of self-mutilation. ... In sum, it appeared to me that Mr. Deere was so bent on self-destruction that it disabled him from cooperating in a meaningful way with the presentation of a defense and caused him to solicit the death penalty.... Mr. Deere’s personality was one of denial about his inadequacies, and his ability to correctly perceive reality was limited. It would have been naive to take Mr. Deere at face value because he was not thinking logically.
Dr. Jones concluded:
In my opinion, which I hold to a reasonable degree of professional certainty, Mr. Deere was not competent to aid and assist counsel in the conduct of a defense in a rational manner due to his mental disabilities, which compelled him to seek death. Mr. Deere simply was not able to make logical judgments about his defense; rather, he had a compulsion to be punished with the death penalty and did not want anyone to interfere with that. Mr. Deere’s insistence on pleading guilty was an irrational part of that compulsion and an outgrowth of his mental disturbances.
Dr. Jones testified in the district court to the same effect as his 1993 declaration. He emphasized that Deere had wanted someone to kill him long before the murders:
[Deere] reported that he had asked other people to kill him before. He did not believe in suicide, but he believed it would be okay if someone else killed him.... In my view, his wanting the death penalty ... was just kind of an extreme amount of masochistic behavior and self-destruction, efforts to destroy himself. He was strongly motivated in that direction at that time.
Dr. Jones testified further “that was my conclusion, [in 1982,] that some of his acting out behavior was quite prov[o]cative towards others, and my belief was that he desired ... to be killed.” Dr. Jones testified that Deere told him that he had even paid others to kill him.
Dr. Rosenthal is a board-certified psychiatrist. He examined Deere twice in December 1992 and prepared a declaration in early 1993. Dr. Rosenthal concluded that Deere was incompetent in 1982. He wrote in his declaration:
Mr. Deere purported to enter a guilty plea, but arrived at that decision under compulsion and substantial pressure from a person on whom he was extremely dependent. He was held in solitary confinement and made constantly aware of threats against his life- by persons inside and outside the jail. He was repeatedly interrogated, including three interviews by his former common-law wife, Cindy Gleason, and he was repeatedly told that he had committed the crimes and deserved to die.
There is substantial evidence that his thought processes were illogical and disturbed during the period of his incarceration. For example, he continued to write to Cindy Gleason, proclaiming his love for her, despite her repeated insistence that he deserved to die and was less than a man....
In my professional opinion, which I hold to a reasonable degree of medical certainty, Mr. Deere’s multiple mental impairments, exacerbated by pressures from his former girlfriend and the condi *1171 tions of his confinement, rendered him incompetent to rationally comprehend his trial proceedings or to aid and assist counsel at trial. I concur in the conclusion of William Jones, Ph.D., who examined Mr. Deere at the time of his plea, and would have advised he was not competent to stand trial.
Because the State had not been able to examine Deere after 1982, and because there was concern that it might therefore be unfair to allow testimony about Dr. Rosenthal’s 1992 examination of Deere, Dr. Rosenthal did not describe his interviews with Deere in his district-court testimony. However, Dr. Rosenthal’s 1998 declaration was entered into the district-court record.
Dr. Armando Favazza is a board-certified psychiatrist. He is an expert on the psychology of people who cut themselves. Dr. Favazza reviewed Deere’s personal history and records, noting Deere’s troubled and violent family history, alcohol abuse, depression, and his “prodigious” self-mutilation. Dr. Favazza concluded that Deere was incompetent in 1982 because he possessed a “pathological fixed idea that he must be killed.” Dr. Favazza testified that Deere’s fixed idea, formulated in early childhood
remained with him to this very day and is a core, central, pathological idea and is preventing him from cooperating with his counsel. He just wants to die, and he’s in a perfect situation right now because he can have the state kill him, and this is what he wants.
Dr. Pablo Stewart is a board-certified psychiatrist. He is also an examiner with the American Board of Psychiatry and Neurology, which grants board certification for psychiatrists. Dr. Stewart also reviewed Deere’s personal history and records. He concluded that Post-Traumatic Stress Disorder was Deere’s primary condition, and that its interaction with Deere’s depression, substance abuse, and possible organic brain damage rendered him incompetent. Dr. Stewart’s assessment of Deere’s competence matched that of Drs. Jones, Rosenthal and Favazza. He testified:
Based on the totality of the record, it is my opinion that [Deere’s] pleading guilty and wishing to be executed was not an independent decision but rather colored by, affected by[,] and was a result of his underlying psychiatric condition.
3. District Court Decision
Ineffective assistance of counsel requires a showing of both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The State does not dispute that Jones performed deficiently. It contends only that there was a lack of prejudice. Prejudice requires that there be a “reasonable probability” that counsel’s deficient performance affected the outcome of the case. The Court wrote in Strickland, “[W]e believe that a defendant need not show that counsel’s deficient conduct more likely than not altered the outcome in the case.... The defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 693-94, 104 S.Ct. 2052 (emphasis added). See also Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); Howard v. Clark, 608 F.3d 563, 568 (9th Cir.2010).
The district court held that Deere established IAC by Jones. Because Dr. Jones was the only qualified professional who had performed a contemporaneous examination, the court relied most heavily on Dr. *1172 Jones’s conclusion. The court also relied, though less heavily, on the conclusion of Dr. Rosenthal, who examined Deere in 1992, and on the conclusions of Drs. Favaz-za and Stewart. The district court discounted Dr. Bolger’s conclusion on the ground that Dr. Bolger was an unqualified evaluator who lied about his qualifications. The court considered Dr. Dietz’s conclusion, but weighed it against the contrary conclusions of Drs. Jones, Rosenthal, Fa-vazza and Stewart. The court held that there was a reasonable probability that, had attorney Jones adequately developed the record in 1982, Deere would have been found incompetent to plead guilty. The court gave its reasons in a careful forty-nine-page order. I agree with the district court.
D. Majority’s Disagreement with the District Court
The majority disagrees with the district court. Its reasons are unconvincing.
First, the majority relies heavily on Dr. Bolger’s conclusion that Deere was competent. It tries mightily to make Dr. Bolger into something other than an unqualified imposter, repeatedly referring to Dr. Bol-ger as a “psychiatrist” and refusing to admit that Dr. Bolger lied when he claimed in sworn testimony that he was board-certified in psychiatry. Op. at 1125-26, 1127-28 and n. 1, 1145-46. However, the parties jointly stipulated in the district court: “Dr. Bolger was never board certified, and his educational credentials did not qualify him for board certification.”
Second, the majority contends that Dr. Bolger and Dr. Jones came to the same conclusions about Deere’s competence in 1982. Op. at 1145-46. This is not true. As a preliminary matter, I note the obvious: Dr. Bolger’s report responded to the court’s question whether Deere was competent to plead guilty. Dr. Jones’s 1982 report did not purport to answer that question. More fundamentally, Dr. Bol-ger’s and Dr. Jones’s conclusions about Deere’s mental state were strikingly different. Indeed, Dr. Bolger wrote two reports, whose conclusions are themselves strikingly different.
Dr. Bolger’s report to the police (which may not have been submitted to the court) contained a “diagnostic impression” that Deere had, inter alia, an “[ajntisocial personality type, with borderline features, not psychotic.” It assessed Deere as having a “dull normal” “intellectual capacity,” and having “narrowed and constricted” judgment. Dr. Bolger’s report to the court described a very different mental state. Dr. Bolger stated that Deere had scored “in the high percentile range” on two I.Q. tests, one of which was the Wechsler Verbal I.Q. test. Dr. Bolger wrote further, “Judgement as tested by verbal skills in aforementioned verbal testing is excellent. ... His I.Q. would be adjudged to be in the high range of normal.” Dr. Bolger concluded: “He displays no evidence of psychosis or abnormal thinking and of course no mental illness is evident.”
Dr. Jones provided a single report, based on two interviews and testing. Dr. Jones provided a more extensive discussion of Deere’s background and family history than either of Dr. Bolger’s reports. Unlike Dr. Bolger, who had provided only a “diagnostic impression” in his first report and no “diagnosis” at all in his second report, Dr. Jones provided a formal diagnosis: “Adjustment disorder with depressed mood[;] Mixed substance abuse disorder, including abuse of alcohol, marijuana, stimulants, a[m]phetamines, etc.[;] Borderline personality disorder with antisocial aspects.” Also unlike Dr. Bolger, who had reported in his first report that Deere had above average intelligence, Dr. Jones reported that Deere was borderline retarded.
*1173 Most important, Dr. Jones provided an analysis of Deere’s mental state that was entirely lacking from either of Dr. Bolger’s reports. Dr. Jones described Deere’s long-standing desire to die at someone else’s hand, which had led to his desire to plead guilty. Dr. Jones wrote, “He feels that suicide cannot be forgiven, but that it is permissible for someone else to kill him. Consequently, he states that he has frequently asked others to kill him and stab him. He has even paid money for this and on one occasion apparently was stabbed.” Dr. Jones wrote in the last two sentences of his report: “There are self-destructive inclinations, but they are blocked from expression in suicide. Some of his acting out behavior may have been an effort to get others to kill him.”
Third, the majority relies on the observations of Judge Metheny, attorney Jones, and the prosecutor. It emphasizes that these people had opportunities to observe Deere, and that none of them concluded that he was incompetent to plead guilty. The relevant time period is 1982, so I do not discount Judge Metheny’s observations on the ground that he was incompetent. But I do note that the opportunities for observation by Judge Metheny and the prosecutor were limited.
More important, mental illness is often not detectable by a lay person. Dr. Stewart testified that those who are mentally ill often “mask” symptoms, and that “people in the criminal justice system will go to great lengths to hide the severity of mental illness where, in fact, their behavior is incompetent, but it’s not seen that way cause they don’t see it as mental illness.” Dr. Stewart testified further that “the fact that the judge, his counsel, bailiffs[,] all these other people thought he was competent, that doesn’t help me one way or the other.” Dr. Rosenthal also testified that a competency determination cannot be based on a layperson’s view: “I don’t think the layperson may pick up things that suggest there’s some doubt about competency. It would be a mistake to rely on the layperson’s judgment to assess whether somebody is competent or not competent.”
Deere’s professional witnesses cautioned against being taken in by Deere’s apparent rationality. Dr. Rosenthal testified that taking “what the client says at face value”
can be a real trap. Because one of the problems of not understanding much about mental illness and the way it presents is that you can get people telling you things that look very legitimate and reasonable when they’re really not and the person is operating in an entirely different world from the one you’re in.
Dr. Favazza agreed. He concluded that Deere tricked attorney Jones into believing that his decision was rational. Dr. Jones testified, “I did not think that you could take Mr. Deere at face value. He — I don’t think he used his rational thinking of doing much of anything in his life, but he would offer rationalizations after the fact at times.”
Fourth, the majority contends that the facts of the crimes and the transcripts of Deere’s guilty plea proceedings show that he was not “out of touch with reality,” and that he “actually understood what was going on.” Op. at 1146. The majority misses the point. Drs. Jones, Rosenthal, Fa-vazza, and Stewart did not conclude that Deere was incompetent to plead guilty based on a disconnection from reality that prevented him from understanding what was “going on.” Rather, they concluded that Deere’s mental illnesses drove his strong desire to die at the hand of someone else. This desire long predated his crime, and so strongly compelled him to plead guilty that he was prevented from making a rational choice.
Finally, the majority writes, “Eleven years after Deere pled guilty, habeas coun *1174 sel came forward with newly-obtained opinions to the effect that Deere’s plea was motivated by an irrational desire to be put to death, rendering him incompetent and his plea invalid.” Op. at 1146. In disparaging what it calls “these belated opinions,” the majority ignores Dr. Jones’s report, prepared in 1982. Op. at 1147. Dr. Jones described in his report Deere’s longstanding desire to be killed by someone else, such that seeking the death penalty would fulfill that desire. Far from being a “belated opinion,” this is a contemporaneous opinion by the only qualified professional who examined Deere in 1982.
Deere’s three other professional witnesses agreed with Dr. Jones. All four witnesses testified to the same thing — that Deere suffered from mental impairments producing a compulsion to seek death at the hand of someone else, that a plea of guilty followed by execution would satisfy Deere’s deep-seated and irrational need, and that Deere’s compulsion prevented him from making a rational choice. In the words of Dr. Favazza, “He just wants to die, and he’s in a perfect situation right now because he can have the state kill him, and this is what he wants.”
Conclusion
There is no greater judicial responsibility than deciding whether a person shall live or die at the hands of the state. The majority makes a grievous error in holding that no hearing was required on the competence of Judge Metheny to sentence Deere to death in 1986. The majority similarly errs in holding that no hearing was required as to whether Jones was ineffective in failing to seek to disqualify Judge Metheny. Finally, the majority errs in holding that Jones did not commit ineffective assistance of counsel in failing to investigate Deere’s competence to plead guilty in 1982.
I respectfully but emphatically dissent.